Joan A. CURY, Plaintiff,

v.

The COLONIAL LIFE INSURANCE COMPANY OF AMERICA, Defendant.

Civ. A. No. 89–4762.

United States District Court, E.D. Pennsylvania.

March 14, 1990.

848

Thomas A. Wallitch, Allentown, Pa., for plaintiff.

Susan L. Parsons, Michael J. Glasheen, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Plaintiff Joan A. Cury initiated this declaratory judgment action against defendant The Colonial Insurance Company of America (Colonial) in the Court of Common Pleas of Lehigh County on May 30, 1989. Colonial filed a timely Notice of Removal to this court pursuant to 28 U.S.C. § 1441 on the basis that the insurance policy at issue in this case is an Employee Welfare Benefit Plan within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461.

In her complaint, plaintiff alleges that she is entitled to disability benefits under a group life insurance policy issued by Colonial to Hamon Power Services, Inc. (Ha-

mon), plaintiff's former employer. Arguing that plaintiff is not entitled to disability benefits under the policy because the condition which rendered her totally disabled was a pre-existing condition for which coverage is unavailable under the policy, Colonial has moved for summary judgment. Based upon the clear, unambiguous language of the policy in question, the medical records of plaintiff and deposition testimony provided in support of Colonial's motion for summary judgment, I conclude that plaintiff's condition was a pre-existing condition within the meaning of the policy and that she is not entitled to disability benefits under the policy. Therefore, I will grant Colonial's motion for summary judgment.

## I.

The material facts of this case are not in dispute. However, resolution of this motion requires a detailed discussion of the facts relevant to plaintiff's disability and medical treatment.[1]

### A. *The Policy and Disability Claim.*

Plaintiff began working for Hamon on July 21, 1986. Hamon provided its employees with certain benefits which included a group, long-term disability policy issued by Colonial. Effective August 21, 1986, plaintiff was insured under this policy.

In a section entitled "Exclusions and Limitations," the policy contained the following language:

*Pre–Existing Condition Limitation.*

A pre-existing condition means a sickness or injury for which you:

a. received medical treatment or consultation;

b. had medical care or service(s);

c. had diagnostic test(s); or

d. took prescribed drug(s) or medicine(s);

within 90 days prior to your effective date.

Exception: The pre-existing conditions exclusion will not apply to diseases or physical conditions disclosed in your application for insurance.

This policy will not cover any disability:

a. caused by;

b. contributed to by; or

c. resulting from;

a pre-existing condition if the disability begins within 12 months after your effective date of insurance.

The pre-existing condition period applicable to plaintiff was from on or about May 21, 1986 to August 21, 1986.[2]

On January 20, 1987, plaintiff ceased working at Hamon as a result of her total disability caused by multiple sclerosis. Since plaintiff's disability began "within 12 months after [the] effective date of insurance," her disability would not be covered by the policy if it was a pre-existing condition as defined by the policy.

Plaintiff claims that because her condition was not "diagnosed" until September 9, 1986 by Dr. Wasserman, her multiple sclerosis is not a pre-existing condition within the meaning of the policy. Plaintiff asserts that September 9, 1986 was the first possible date on which she could have been diagnosed as having multiple sclerosis.

Colonial argues that a diagnosis of the pre-existing condition is not required by the terms of the policy. Instead, Colonial takes the position that plaintiff received medical treatment, consultation, diagnostic tests and/or medication for her multiple sclerosis during the pre-existing condition period, and, therefore, is not entitled to long-term disability benefits under the policy. Further, assuming that plaintiff cor-

---

1. I will refer to plaintiff's medical records throughout this memorandum. I note that plaintiff has admitted that the records are accurate copies of the records maintained by her physicians. Plaintiff's deposition testimony is consistent with the doctors' notes regarding her condition. Finally, plaintiff's doctors testified extensively regarding the contents of these records during their depositions.

2. Because plaintiff did not undergo any medical treatment between the period of May 16, 1986 and June 1, 1986, the exact date on which the pre-existing condition period commenced is not crucial to resolution of this motion.

rectly argues that a diagnosis of the pre-existing condition during the exclusion period is required in order for the exclusion to apply, Colonial asserts that plaintiff was diagnosed with multiple sclerosis prior to and during the pre-existing condition period.

## B. *Multiple Sclerosis.*[3]

Multiple sclerosis is a neurodegenerative disease of the white matter of the brain and spinal cord. The etiology of multiple sclerosis is presently unknown. However, some medical experts believe that multiple sclerosis might be caused by exposure to an infectious virus during childhood which later breaks down the structure of the nervous system. Another possible cause is an attack upon ones own system by his or her own autoimmune process. There is no cure for multiple sclerosis, and the disease usually follows a slow, progressive course marked by a history of exacerbations and remissions. Steroids have been used with some success to attenuate the acute episodes of the disease.

The symptomatology of multiple sclerosis includes weakness, fatigue, incoordination, and difficulty walking. Another common symptom of multiple sclerosis is spastic paraparesis which is a stiffness, weakness, or spasticity in the lower extremities. Finally, depression is very common in multiple sclerosis patients.

An unequivocal diagnosis of multiple sclerosis is not possible. Instead, neurologists categorize their patients as possible, probable or most likely having the disease. The level of diagnosis depends upon the symptomatology of the patient and the results of the few tests which have been determined to be helpful in the diagnosis of multiple sclerosis.

In respect to testing, a magnetic resonance imaging (MRI) test is the most sensitive diagnostic test for detecting multiple sclerosis. Eighty or more percent of the patients with multiple sclerosis test positive on an MRI. A spinal tap is frequently used as a diagnostic tool for patients who might have multiple sclerosis. The spinal fluid is tested for abnormal proteins also known as oligoclonal bands. In addition, the IGG level of the spinal fluid is also measured. Patients with multiple sclerosis commonly have an elevated IGG level.

A "most likely" diagnosis of multiple sclerosis is made in patients exhibiting the characteristic symptoms of the disease as well as diagnostic tests which reveal the existence of an elevated IGG level, oligoclonal bands and lesions on the MRI. This is the most definitive diagnosis of multiple sclerosis which can be made. In those patients that fall into the "likely" or "probable" category, the clinical history would not be as clear and the diagnostic tests less typical for the disease. Patients suspected of having multiple sclerosis because of the characteristic symptoms but without the supporting laboratory tests are placed into the "possible" category.

## C. *Plaintiff's Relevant Medical History.*

During the summer of 1985, plaintiff began to notice a weakness in her legs which was exhibited by an inability to climb the stairs on one occasion. In addition, she suffered from unusual bouts of fatigue. She also noted a difficulty in controlling her right hand which was more pronounced when she was tired or fatigued. After consulting her family physician, Dr. Vogler, she was referred to a neurologist, Dr. McCoy, in December 1985.

Dr. McCoy initially examined plaintiff on December 3, 1985. In his report to Dr. Vogler, Dr. McCoy made findings consistent with plaintiff's complaints and stated:

> [P]atient has an apparent spastic paraparesis. I would suspect that this may indeed be related to her residual polio. However, she indicates that she was able to do aerobics and other exercises in the past such as running and I would anticipate that she would have great difficulty doing these at the present time. Additional studies to more adequately exclude the possibility of spinal cord compres-

3. All information concerning multiple sclerosis referred to herein is based solely upon the un-

contradicted deposition testimony of Drs. McCoy and Schotland.

sion, demyelinative process or other neuro-muscular degenerative disease would be suggested.

At this early stage, Dr. McCoy considered several possible causes of plaintiff's symptoms including post-polio syndrome [4] and a demyelinative process.[5] At his deposition, Dr. McCoy testified that plaintiff's symptoms on December 5, 1985 were consistent with multiple sclerosis as well as several other neurological abnormalities.

Shortly thereafter, plaintiff was admitted to Muhlenberg Hospital Center (MHC). Her primary complaint at the time was progressive weakness involving her lower extremities. While at MHC plaintiff underwent a myelogram for the detection of a possible spinal tumor and an oligoclonal proteins test. The myelogram was normal. Prior to receiving the results of the oligoclonal proteins test, plaintiff was discharged with a probable diagnosis of myasthenia gravis. Mestinon, a drug normally used in the treatment of myasthenia gravis, was prescribed for plaintiff.

In early February 1986, the plaintiff's test results were received. The report of the oligoclonal proteins test stated:

> An oligoclonal IGG pattern is present in the [spinal fluid]. This may be associated with multiple sclerosis and with other neurologic diseases, including encephalitis, meningitis, panencephalitis and idiopathic polyneuritis.

Because plaintiff did not respond favorably to the mestinon and the positive test for oligoclonal bands, Dr. McCoy eliminated myasthenia gravis as a possible diagnosis. Dr. McCoy's notes of February 13, 1986 provide as follows:

> the oligoclonal bands were positive. It is therefore felt that it is most likely that she has Multiple Sclerosis rather than Myasthenia and she was told to discontinue the Mestinon …
>
> It was explained to the patient that she has an inflammatory demyelinative disease and it was specifically indicated that

this would be consistent with diagnosis of Multiple Sclerosis.

Dr. McCoy prescribed steroids and B complex vitamins for plaintiff. Both items are commonly prescribed for patients with multiple sclerosis.

Thereafter, plaintiff was referred to Dr. Schotland, a neurologist at the hospital at the University of Pennsylvania, for a consultation. Dr. Schotland recommended that a MRI be performed. Based upon his examination of plaintiff and her history provided to him, Dr. Schotland made the following findings:

> [The patient] was in good health until approximately 2 years ago when she noted the onset of stiffness and clumsiness in walking which has been slowly progressive. This has involved the right leg greater than the left leg. More recently she has also noted clumsiness of the right hand with a change in her handwriting and some difficulty in opening jars.
>
> \*  \*  \*  \*  \*  \*
>
> She walks with a moderately spastic gait and scrapes her right foot….
>
> The diagnostic picture is not entirely clear but in view of the spastic paraparesis and the 18% IGG in the spinal fluid I believe that multiple sclerosis is the leading possibility.

At his deposition, Dr. Schotland testified that he placed plaintiff's diagnosis between the "likely" and "most likely" category at this time. He did state that a slow growing tumor or amyotrophic lateral sclerosis (ALS or Lou Gehrig's disease) were still possibilities; however, he ruled out the possibility of post-polio syndrome because plaintiff's symptoms of spasticity were inconsistent with this disease.

Less than a week before the commencement of the pre-existing condition period, a MRI was performed upon plaintiff on May 16, 1986. The report issued on May 21, 1986 gave the following impression: "Both

---

**4.** Plaintiff had polio when she was four years old. Other than this, she had a fairly unremarkable medical history. Dr. McCoy never completely abandoned post-polio syndrome as a possible diagnosis for *part* of plaintiff's health problems.

**5.** Multiple sclerosis falls within this category.

diffuse and multifocal white matter disease in a distribution atypical for multiple sclerosis. MS is still a likely diagnosis." At his deposition, Dr. Schotland explained the significance of this report as follows:

A: In a broad sense it means the findings do not rule against the disease, are seen in the disease but are not totally typical.

\*    \*    \*    \*    \*    \*

A: In the middle of the brain there are areas, empty areas which contain spinal fluid we call ventricles. The characteristic lesions of multiple sclerosis are found right next to the ventricles, called periventricular lesions. Her lesions were not quite at that spot; a little further out.

Q: But have you seen multiple sclerosis patients with lesions like Joan Cury?

A: Yes.

\*    \*    \*    \*    \*    \*

Q: Again, with regard to the scale we were talking about, and based on what you knew as of June of '86, where do you put her now?

A: I would say "most likely."

### D. *The Pre-existing Condition Period.*

On June 3, 1986, Dr. Schotland communicated the findings of the MRI to plaintiff by returning her telephone call, and advised her to continue seeing Dr. McCoy for the management of her condition. In addition, Dr. Schotland advised Dr. McCoy of his findings.

Shortly thereafter, plaintiff contacted the Multiple Sclerosis Association to obtain information about multiple sclerosis.

Plaintiff continued to consult Dr. McCoy regarding her condition. After an office visit on June 17, 1986, Dr. McCoy recorded the following observations:

The patient walks in a very slow fashion and she appears moderately depressed but she is able to ambulate without need for assistance and without major difficulty. I did not repeat her neurologic examination but suspect that her neurologic examination would not be dramatically different from the time of her initial evaluation.

There continues to be a great deal of confusion as to her diagnosis. She herself comments that she is basically fatigued and tired and she does not know if it "is related to the M.S., the post-polio syndrome or depression." My own inclination is that depression is the major problem.

I feel that she does indeed have a post-polio syndrome which is responsible for some of the fatigue and tiredness but do not feel that any of her symptomatology at the present time is related to the M.S. and still have some reservations in my own mind as to whether this diagnosis is correct even though the [MRI] is felt to be consistent with the diagnosis. This was discussed at great length. I also indicated to the patient that I would try as much as possible to avoid her going on disability and try to keep her as active as possible. She has talked to Corine at the M.S. Association and requested a prescription for a wheelchair that she would be able to use when she goes "to the mall." A prescription was given although I would prefer not to have her use a wheelchair and this was explained. . . .

In addition to the prescription for a wheelchair, Dr. McCoy also prescribed Desyrel and Triavil, anti-depressants, for plaintiff during the period between June 1986 and August 1986. Finally, plaintiff spoke with Dr. McCoy on two other occasions during this same period concerning her medication and condition.

Dr. McCoy testified at his deposition that he informed plaintiff that her studies were consistent with multiple sclerosis, but that depression was her major problem. He also explained at his deposition that depression is a significant problem in individuals with multiple sclerosis.

On September 9, 1986, less than three weeks after the termination of the pre-existing condition period, plaintiff consulted Dr. Wasserman. In his report of the same date, Dr. Wasserman opined that plaintiff "most likely" had multiple sclerosis. Interestingly, Dr. Wasserman's diagnosis was

based upon exactly the same information available to Drs. Schotland and McCoy.

Several months later, plaintiff submitted a claim for total disability under the policy issued by Colonial.

## II.

■ The group life insurance policy at issue in this case is an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1). *See also* 29 U.S.C. §§ 1003(a), 1054(a). As a participant in this plan, *see* 29 U.S.C. § 1002(7), plaintiff may initiate a civil action to enforce her rights under the plan. 29 U.S.C. § 1132(a)(1)(B) [§ 502(a)]. Accordingly, Colonial properly removed this matter from state court. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 66, 107 S.Ct. 1542, 1548, 95 L.Ed.2d 55 (1987) ("Congress has clearly manifested an intent to make causes of action within the scope of the civil enforcement provisions of § 502(a) removable to federal court."); *see also* 28 U.S.C. 1441.

"[F]or purposes of actions under § 1132(a)(1)(B), the *de novo* standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest." *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, ——, 109 S.Ct. 948, 956, 103 L.Ed.2d 80, 93 (1989). Accordingly, I shall review plaintiff's claim for disability benefits *de novo*. In addition, a federal common law of rights and obligations must be developed by federal courts to resolve disputes arising from ERISA regulated plans. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987). As in this case, the validity of a claim for benefits under an ERISA plan will ordinarily rest upon the court's interpretation of the language of the plan at issue. Therefore, in addition to case law construing pre-existing condition exclusions in insurance policies, I will rely upon traditional principles of contract interpretation to resolve the issues raised by this case.

■ First, I must determine as a matter of law whether the contract provision at issue is ambiguous. *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir.1986). "[A]mbiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 n. 10 (3d Cir.1980). A contract is ambiguous if it (1) is reasonably susceptible to different constructions; (2) is obscure in meaning through indefiniteness of expression, or (3) has a double meaning. *Metzger v. Clifford Realty Corp.*, 327 Pa. Super. 377, 476 A.2d 1, 5 (1984).

Plaintiff argues that she did not receive consultation or treatment for her multiple sclerosis until after the fall of 1986. She further argues that she could not have received a consultation or any treatment for her multiple sclerosis until it was diagnosed *after* the expiration of the pre-existing condition period. In support of this argument, plaintiff relies almost exclusively upon the affidavit of Dr. Christopher Lynch which states in pertinent part:

3. It is my professional opinion that it is very difficult for any physician to state when multiple sclerosis starts. A physician must wait until enough symptoms occur for the diagnosis to be made.

4. It is my opinion, based upon my knowledge of the Plaintiff and the medical records on her case, that enough symptoms did not appear for a diagnosis of multiple sclerosis to be made until the Fall of 1986, at which time this condition could be diagnosed with as much certainty as possible. That until a diagnosis could be made, a patient could not receive consultation for or treatment for a condition such as multiple sclerosis. In fact, it is my opinion that one cannot have a diagnostic test[ ] "for" multiple sclerosis until it is diagnosed. In other words, diagnostic tests are for the purpose of diagnosis and to rule out many possible conditions.

5. In my opinion, Joan Cury did not receive medical treatment or consultation, medical care or services, diagnostic tests or drugs or medication for multiple sclerosis prior to the Fall of 1986.

854

Colonial objects to Dr. Lynch's affidavit on two grounds. First, Colonial argues that Dr. Lynch's affidavit should be stricken because plaintiff never disclosed his name as a possible expert witness during the course of discovery. Second, Colonial argues that Dr. Lynch's affidavit represents an improper legal interpretation of an unambiguous contract provision.

Pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, affidavits relied upon in support of or opposing a motion for summary judgment should set forth facts which would be admissible. Because I conclude that the language of the pre-existing condition exclusion in Colonial's policy is unambiguous and susceptible to only one reasonable interpretation, I agree that Dr. Lynch's "interpretation" of the policy is not admissible. *See Harbor Insurance Co. v. Lewis*, 562 F.Supp. 800, 802–03 (E.D.Pa. 1983) (stipulation which placed a legal interpretation upon a insurance policy endorsement was rejected); *see also TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 549 (6th Cir.1981) (absent any need to clarify or define terms of art, science or trade, expert opinion testimony to interpret contract language is not admissible); *Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 737 (9th Cir.1980) (witness should not have been permitted to testify as to legal effect of written agreements). Therefore, to the extent that Dr. Lynch's affidavit offers a legal interpretation of the clause at issue in this case, I shall not consider his opinion. However, I will consider his affidavit to the extent that it offers an opinion regarding plaintiff's condition and course of treatment.[6]

Plaintiff incorrectly argues that her disability does not fall within the pre-existing condition period, because no doctor rendered a diagnosis of multiple sclerosis during the pre-existing period. As previously stated, the policy exclusion applicable to this case is unambiguous. The plain language of the clause only requires that the claimant either (a) receive medical treatment or consultation; (b) have medical care or services; (c) have diagnostic tests, or (d) take prescribed drugs or medicines within 90 days prior to your effective date. There is no requirement that a diagnosis, definite or otherwise, of the pre-existing condition must be made during the pre-existing condition period.

The case law cited by Colonial supports this conclusion. For example, in *Ranieli v. Mutual Life Ins. Co. of America*, 271 Pa. Super. 261, 413 A.2d 396 (1979), the policy at issue excluded coverage for any "sickness" contracted within thirty days of the issuance of the policy. The court stated as follows:

> Sickness has been deemed to have its inception when the disease first becomes manifest or active, or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease.

*Id.* 413 A.2d at 401; *see also Zeh v. National Hospital Ass'n*, 233 Or. 221, 377 P.2d 852 (1963) (plaintiff underwent several unsuccessful treatments regarding his condition which was not diagnosed prior to the inception of the insurance policy; however, the examination and recommendation for treatment prior to the definitive diagnosis constituted medical care within the exclusion in the insurance policy); *Mutual Life Ins. Co. of New York v. Bohannon*, 488 S.W.2d 476 (Tex.Civ.App.1972) (despite the fact that the insured's symptoms were previously misdiagnosed and treated as anemia during the months preceding the effective date of the policy, insured's blind loop syndrome diagnosed after the policy became effective was a pre-existing condition because anemia is a symptom of blind loop syndrome).

The conclusion reached herein is also supported by the decision of the Massachusetts Supreme Judicial Court in *Dowdall v. Commercial Travelers Mutual Accident Ass'n of America*, 344 Mass. 71, 181 N.E.2d 594, 596 (1962). In this case, an insured was treated prior to the effective date of a policy for symptoms which later proved to be multiple sclerosis. The court concluded that while a definitive diagnosis

---

**6.** I decline to reach Colonial's other objection to the affidavit of Dr. Lynch.

was not made prior to the effective date of the policy, it was apparent that the progress of the disease was considerably advanced at the time the policy was issued. Therefore, the court concluded that the insured was not entitled to coverage for multiple sclerosis.

In the instant case, disability coverage was specifically excluded for any "sickness" for which the insured sought certain types of medical assistance within ninety days of the effective date of the policy. The record provided herein clearly demonstrates that multiple sclerosis manifested itself in plaintiff prior to and during the pre-existing condition period. Therefore, regardless of whether a diagnosis was made, plaintiff would not be entitled to coverage if she received medical treatment, diagnostic tests or consultations, or took medicines for her "sickness."

Because a diagnosis during the pre-existing condition period is not necessary, I need only concern myself with the question of whether plaintiff received treatment, consultation, medical care, medical services, diagnostic tests, or prescribed drugs during the pre-existing condition period between May 21, 1986 and August 21, 1986.

As outlined above, plaintiff underwent a MRI test, the most reliable test for the detection of multiple sclerosis, just prior to the commencement of the pre-existing condition period. On June 3, 1986, Dr. Schotland communicated the findings of the MRI to plaintiff.[7] Further, he advised her to continue seeing Dr. McCoy for the management of her condition. This was a consultation, within the meaning of the policy, regarding the condition, multiple sclerosis, which plaintiff claims caused her total disability.

Also, plaintiff continued to consult Dr. McCoy regarding her condition during the pre-existing condition period. From an office visit on June 17, 1986, Dr. McCoy observed that plaintiff walked in a very slow fashion, appeared moderately de-

pressed, and was fatigued. Dr. McCoy discussed plaintiff's condition with her at length. During the same visit, plaintiff requested and received a prescription for a wheelchair for use when she went to the mall. In addition to the prescription for a wheelchair, Dr. McCoy also prescribed Desyrel and Triavil, anti-depressants, for plaintiff.

This office visit with Dr. McCoy amounts to medical treatment or consultation within the meaning of the insurance policy. Dr. McCoy's notes confirm the existence of the classic symptoms of multiple sclerosis, and that he informed plaintiff that her studies were consistent with multiple sclerosis. While Dr. McCoy felt that plaintiff's major problem at that time was depression and he questioned the accuracy of the working diagnosis, plaintiff clearly consulted Dr. McCoy at this time regarding the condition or "sickness," multiple sclerosis, for which she ultimately claimed total disability. Moreover, the mere fact that Dr. McCoy retained some doubts about the correct diagnosis or felt that plaintiff had problems beyond that of multiple sclerosis does not alter this conclusion.

Plaintiff also discussed her medication and overall condition with Dr. McCoy on two other occasions during the pre-existing condition period. While the exact content of these discussions is not known, it appears that the primary focus of these discussions was her depression. Finally, Dr. McCoy prescribed Desyrel and Triavil for plaintiff during the pre-existing condition period. Both drugs were prescribed in response to plaintiff's problems with depression. Colonial argues that because plaintiff's depression was caused by her multiple sclerosis that this would constitute consultations and prescriptions for the pre-existing condition. Because of the conclusions reached above with respect to plaintiff's discussions with Dr. Schotland and office visit with Dr. McCoy, I need not resolve this issue.

---

7. I note that plaintiff's knowledge of the actual diagnosis is not a prerequisite to the applicability of the pre-existing condition clause in the policy. See *Knepp v. Nationwide Ins. Co.*, 324 Pa.Super. 479, 471 A.2d 1257 (1984) (insured's knowledge of pre-existing illness is not material to question of whether she is entitled to benefits under the policy).

Based upon the foregoing, I conclude that plaintiff received medical treatment or consultation regarding a "sickness" during the pre-existing condition period. This "sickness" turned out to be the same sickness for which plaintiff later sought total disability benefits under the policy issued by Colonial. Therefore, the exclusion applies to this case and plaintiff is not entitled to disability benefits under the policy.

 While it is certainly obvious that plaintiff received much more extensive diagnostic testing, treatment, consultation and medication prior to the commencement of the pre-existing condition period, it is undisputed that she did receive consultations or treatment during the pre-existing condition period.[8] Moreover, despite plaintiff's argument to the contrary, a definite diagnosis of multiple sclerosis need not be made in order for a person to receive a consultation, diagnostic test or other form of medical treatment for a condition. If this were true, then multiple sclerosis could never really be considered a pre-existing condition within the meaning of the policy. The uncontroverted evidence presented in this motion establishes that a one hundred percent certain diagnosis for multiple sclerosis is not possible without the aid of an autopsy. If the drafters of policy intended to require that a diagnosis for the condition be made during the pre-existing condition period, they could have easily done so explicitly.[9]

**8.** The affidavit of Dr. Lynch does not alter this result. His affidavit is based upon the erroneous conclusion that a diagnosis must be made before the pre-existing condition exclusion would apply. However, as explained above, no such requirement exists.

**9.** Even if plaintiff's argument that a diagnosis of multiple sclerosis was necessary for the exclusion to apply is valid, I conclude that a sufficiently definite diagnosis was made during the pre-existing condition period. While it is true that the diagnosis made at this time was somewhat equivocal, it is undisputed that multiple sclerosis cannot be diagnosed with one hundred percent certainty. This is evinced by the diagnosis of Dr. Wasserman who reviewed plaintiff's condition after the pre-existing condition period. He concluded that plaintiff "most likely" had multiple sclerosis. This diagnosis, based

### III.

Although the bulk of plaintiff's diagnostic testing, medical treatments and consultations regarding her multiple sclerosis occurred prior to the commencement of the pre-existing condition period, plaintiff did receive medical treatment and/or consultation during the pre-existing condition period. For the reasons stated above, plaintiff is not entitled to disability benefits under the policy issued by Colonial. Consequently, I will grant Colonial's motion for summary judgment.

upon the same information available to Dr. Schotland a few months earlier, was no more certain than that of Dr. Schotland.

The testimony of Drs. McCoy and Schotland and the test results clearly establish that a diagnosis of multiple sclerosis was made during the pre-existing condition period. They both told plaintiff that her symptoms and tests results were consistent with multiple sclerosis. Dr. Schotland offered his opinion that she probably or "most likely" had multiple sclerosis. Although Dr. McCoy still harbored some doubts about the accuracy of plaintiff's diagnosis during the pre-existing condition period, he conceded during his deposition that plaintiff's symptoms were consistent with the disease, that he advised plaintiff of this fact, and that multiple sclerosis was the leading possibility at the time.