Katherine W. McGRATH, Executrix of the Estate of Keith J. McGrath, Plaintiff,

v.

The HOME INSURANCE COMPANY, a corporation of the State of New Hampshire, Defendant.

Civ. A. No. 92–115–JLL.

United States District Court, D. Delaware.

Jan. 27, 1993.

Bernard Van Ogtrop and Paula G. Caputo of Cooch and Taylor, Wilmington, DE, for plaintiff.

Beth H. Christman of Casarino, Christman & Shalk, Wilmington, DE, for defendant.

OPINION

LATCHUM, Senior District Judge.

I. INTRODUCTION

Defendant, The Home Insurance Company, a corporation of the State of New Hampshire, has brought this motion pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking summary judgment against plaintiff, Katherine W. McGrath, executrix of the estate of Keith L. McGrath. (Docket Item ["D.I."] 16.) Plaintiff commenced this action on February 25, 1992, seeking declaratory judgment of her rights under the blanket accident insurance policy issued by defendant to plaintiff's husband's employer, ICI American Holdings Inc. (hereinafter "ICI").[1] In particular plaintiff seeks a declaratory

---

1. It is undisputed by the parties that Home Insurance issued to ICI a blanket accident policy, Policy No. GT–2 07 74, which policy was in effect at the time of plaintiff's husband's death. (D.I. 1 at ¶ 5; D.I. 5 at ¶ 5.) It is also undisputed that plaintiff's husband is a "Covered Person" under the meaning of the policy. (D.I. 16 at 3.)

judgment that approximately $364,000.00 in accidental death benefits be paid her under said policy.[2] (D.I. 1.)

█ Plaintiff contends that her husband was covered by the Home Insurance Policy when he died because the activity in which he was engaged constituted a bona fide business trip under the terms of the policy. Defendant contends that the activity in which plaintiff's husband was engaged was a personal endeavor and thus he was not covered under the terms of the policy. (D.I. 1 at ¶ 11.; D.I. 5 at ¶ 11.) The only issue before this Court is the legal issue of whether or not the undisputed factual events surrounding plaintiff's husband's death constitute an activity which triggers insurance coverage under the terms of the provision of the Home Insurance policy cited in plaintiff's complaint. For the reasons set forth below, this Court finds that plaintiff's husband's activities at the time of his death did not fall within the provisions of the Home Insurance policy and thus this Court will grant defendant's motion for summary judgment.

It is undisputed and this Court finds that the blanket accident insurance policy issued by Home Insurance to ICI is an employee benefit plan within the meaning of the Employee Retirement Income Security Act, (hereinafter "ERISA") 29 U.S.C. § 1001 *et seq.;* 29 U.S.C. § 1002(1) and (3). (D.I. 1 at ¶ 9; D.I. 5 at ¶ 9.) Thus, the Court has jurisdiction over this matter pursuant to 29 U.S.C. § 1132(f).

## II. FACTS

On Saturday May 12, 1990, Keith McGrath, plaintiff's husband and an ICI employee, was killed by a truck while riding his bicycle in the American Diabetes Association Bike Ride Plus (the "Bikea-

thon"). The Bikeathon was organized by the American Diabetes Association to raise money for diabetes research and, as part of its fund-raising events, the American Diabetes Association sponsored a "team challenge" within the Bikeathon. (D.I. 16 3–5.) Plaintiff contends that her husband was on a bona fide business trip in that he was on assignment by or at the direction of his employer, ICI, for the purpose of furthering the business of ICI, when he was riding and was killed in the bikeathon. (D.I. 1 at ¶ 11.) Plaintiff bases that contention on the fact that her husband rode in the bikeathon as part of the ICI corporate team.

Entry in the corporate cup challenge of the bikeathon differed from individual participation in the following relevant respects:

1) A corporate entry fee of $250.00 was paid for an entire team of up to 16 riders. Persons riding as individuals and not part of a corporate team were required to pay an entry fee of $15.00. (D.I. 16 Exhibit C at 6; D.I. 19 Exhibit A at 6 and Exhibit D.)

2) Team riders were permitted to pool their sponsorship money in order to compete for a corporate trophy cup. The team with the most sponsorship contributions received a trophy with the name of the team inscribed on its face. (D.I. 16 Exhibit C at 6–7; D.I. 19 Exhibit A at 6.)

3) The corporate cup challenge was open to businesses with 100 or more employees. The businesses, in turn, paid the minimum $250.00 donation which served as the team's entry fee. (D.I. 19 at Exhibit D.)

ICI sponsored a team in the bikeathon's corporate cup challenge in 1988, 1989 and 1990.[3] Sponsorship predominantly meant

---

**2.** Plaintiff's complaint also seeks recompense for the cost of this action and reasonable attorney's fees under 29 U.S.C. 1502(g) and 29 U.S.C. § 1121(g). (D.I. 1 at ¶ 12 (C).) As defendant's answer to plaintiff's complaint correctly states, neither of those two sections exists in the United States Code. Plaintiff has failed to amend her complaint and thus has failed to state a claim upon which relief can be granted for these costs. Nevertheless, this Court notes that 29 U.S.C. § 1132(g) permits reasonable attorney's

fees and costs at the discretion of the trial court. However, since this Court also finds that plaintiff's action is unable to survive defendant's motion for summary judgment, it is unnecessary to address the claim for attorney's fees and costs.

**3.** There was considerable deposition testimony concerning the fact that William Metten, the ICI official who approved the $250.00 entry fee for the ICI corporate team in 1990, had originally denied the request and had changed his opinion

that ICI paid the $250.00 entry fee for the team and allowed its name to be used to identify the team on the trophy cup. (D.I. 19 Exhibit A at 32; D.I. 16 Exhibit C at 32.) The ICI corporate team won the corporate challenge cup in 1988, 1989 and 1990 and was awarded a trophy cup with the ICI company name inscribed upon it each year. (D.I. 19 Exhibit A at 32; D.I. 16 Exhibit C at 32.) The team captain and founder, Richard W. Brown, (D.I. 19 Exhibit A at 3–4; D.I. 16 Exhibit C at 3–4) placed the cup in the ICI fitness center after it was first won in 1988, but after finding that the trophy was being used as a hat-rack, moved it to his own home after it was reissued in 1989. (D.I. 19 Exhibit A at 7–8; D.I. 16 Exhibit C at 7–8.)

For the 1989 corporate cup challenge, ICI paid for bicycle shirts with the ICI logo printed on them. The logo printed on the shirts was the ICI roundel, approximately six to eight inches in diameter with the words "World Class" printed underneath. ICI provided the shirts at the request of team captain Richard Brown, but ICI did not require that any team member wear the shirt. In addition, there were team members who were not ICI employees, as was permitted by the rules. ICI did not provide team shirts in 1988 or 1990. In 1990, however, many of the team members including plaintiff's husband, who still had the 1989 shirts, wore them while riding in the bikeathon event.

ICI's participation in the event also extended to permitting its bulletin boards and certain in-house publications [4] to be used to communicate the event to other employees. The use of the over 400 bulletin boards and in-house publications required a certain degree of corporate approval. A part of the corporate approval process involved consid-

erations of, among other things, management views on the major activities, the extent to which the business units were involved in various activities, and whether or not the activity was a corporate-sanctioned event. (D.I. 19 Exhibit B at 10–13.)

The ICI corporate team was organized by its captain, an ICI lab technician, Richard W. Brown. (D.I. 19 Exhibit A at 3, 6–7; D.I. 16 Exhibit C at 3, 6–7.) Mr. Brown testified at his deposition that: 1) he had begun riding in the diabetes bikeathon in 1987; 2) he had originally become involved in the bikeathon because he had had a very close friend who had died from diabetes-related complications; 3) the ICI bikeathon team had come about through his efforts in that after he had become cognizant of the team challenge he had approached someone in the *Corporate Communications* department of ICI and had asked for sponsorship, which meant, in essence, that he had asked for ICI to contribute the $250.00 entry fee in order to have the riders "actually sponsored and named as a team"; and 4) he had organized the team by distributing fliers and literature around ICI and placing phone calls to people whom he thought might be interested in riding. (D.I. 19 Exhibit A at 3–10; D.I. 16 Exhibit C at 3–10.)

Mr. Brown also testified that the 1990 bikeathon was held on a Saturday; that ICI paid no compensation to any of the riders (*Id.* at 10); that he did not work in a supervisory capacity to Mr. McGrath and that he had no authority to direct Mr. McGrath in terms of performing duties at ICI. (*Id.* at 11.) Mr. Brown also testified that each rider supplied his or her own bicycle and that as far as he knew no ICI business was being conducted in the riding of the bikeathon. (*Id.* at 16–17.) Mr.

---

only because Richard Brown, ICI employee and team captain, had made an eloquent appeal arguing that the morale of the riders/employees would suffer were they not permitted the opportunity of defending their 1989 cup. Since this Court finds that payment of the entry fee whether whole-hearted or half-hearted, does not, by itself, raise the activity of riding in the bikeathon to the level of an *assignment by or at the direction of* ICI and thus does not constitute the requirements for insurance coverage as outlined in the Home Insurance policy, this Court will

omit further discussion of Metten's motivations as detailed in the depositions submitted by both parties.

4. The publications were predominantly in-house, although ICI retirees and non-employees whose names were on a small mailing list maintained by ICI also received some of the publications which included mention of the bikeathon. (D.I. 19 Exhibit B at 28.)

Brown's deposition testimony further stated that it was his understanding that the team members who were not ICI employees were not riding as temporary employees of ICI on the day of the bikeathon. (*Id.* at 17.)

There was no deposition testimony offered stating that anyone riding in the bikeathon considered himself to be on business travel; there was considerable deposition testimony to the contrary. Richard Brown testified that he did not go to his supervisor or to anyone else to get authorization to do business travel before riding in the 1990 bikeathon because he "didn't perceive it as a business-related activity." (*Id.* at 20.) William McKay, the ICI employee who was Keith McGrath's supervisor testified at his deposition concerning the procedure at ICI that Keith McGrath would have been expected to follow before undertaking business travel for ICI. McKay stated that the common procedure would have been for McGrath to make a request either verbally or in writing to McKay, and then for McKay to review the request to see whether it was "justified according to the business needs" of ICI and to determine whether there were funds allotted in the ICI budget to cover the expense. (D.I. 16 Exhibit B at 4.) McKay also testified that McGrath had not come to him at any time before May 12, 1990, to request approval "for business travel to ride in the bikeathon for the American Diabetes Association on Saturday, May 12, 1990."[5] (*Id.* at 5.)

Finally, McKay testified that it was his opinion that McGrath was not engaged in promoting the business of ICI while riding in the bikeathon because "the nature of business travel as defined by company policy is in strict accordance with IRS regulations and has to be in keeping with the purpose of our business as commonly established by policy and procedures." In addition McKay stated that the bikeathon,

in his opinion, "would not fall into that category." McKay considered the event a social event that had no relationship with McGrath's work for ICI. (*Id.* at 6–7.)

Plaintiff, Mrs. Katherine McGrath, testified at her deposition that Richard Brown and her husband did not work together at ICI; that it was Richard Brown who first contacted her husband to ride in the bikeathon; and that Richard Brown, to her knowledge, had no supervisory authority over her husband. (D.I. 16 at Exhibit E at 3–4.) Mrs. McGrath further testified that it was her opinion that her husband's participation in the bikeathon was voluntary. However, she also testified that she had argued with her husband and had asked him to back out of the bikeathon but that he had refused because he had felt committed to ICI since ICI had paid the entrance fee. She characterized his commitment as a "moral principles thing" akin to not taking home company paper clips and as an obligation based on the fact that "he was part of a team, and that he was representing the company he worked for." (D.I. 16 Exhibit E 11–12.) She also testified that his interest in bike riding played a large part in his decision to ride in the bikeathon. (*Id.* at 13.)

John W. Moore, an ICI employee who also rode in the 1990 bikeathon testified that no one at ICI told him that he had to ride in the bikeathon; that he did not request authorization to ride in the bikeathon from his supervisor; that he did not feel that anyone at ICI could tell him that he had to ride in the bikeathon; and that he did not feel that he was involved in any business for ICI when he rode in the bikeathon. Instead he testified that he considered the ride to be a personal endeavor. (D.I. 16 Exhibit G at 6–10.)

III. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment "if the pleadings,

---

**5.** McKay also testified that unless he were absent McGrath's requests for business travel would have to be processed through him; that if he were absent and McGrath requested permission from a superior, he, McKay, would eventually have been made aware of the request; and finally, that he, McKay, was never made aware of any such request from McGrath concerning the 1990 bikeathon. In fact, McKay stated that had McGrath made such a request, he McKay would have considered the request "extraordinary." (D.I. 16 Exhibit B at 12–15.)

depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The appropriate inquiry is whether there is a need for a trial. "In other words, [are] there any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Supreme Court has held that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249–50, 106 S.Ct. at 2510–11. (Citation omitted.)

In a motion for summary judgment it is the party seeking summary judgment who bears "the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

"On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

## IV. DISCUSSION

The section of the Home Insurance Policy under which plaintiff claims coverage reads, in pertinent part, as follows:

The hazards against which insurance is provided a Covered Person,[6] under this Policy, are:

Injury sustained by such person anywhere in the world while on the business of the Policyholder and during the course of any bonafide [sic] trip made by the Covered Person.

Such trip shall be deemed to have commenced when the Covered Person leaves his residence or place of regular employment for the purpose of going on such trip, whichever last occurs, and shall continue until such time as he returns to his residence or place of regular employment, whichever first occurs....

## DEFINITIONS

The term "while on the business of the Policyholder" means while on assignment by or at the direction of the Policyholder for the purpose of furthering the business of the Policyholder. Injury sustained during the course of every day travel to and from work and bonafide [sic] leaves of absence or vacations, shall not be deemed to be sustained while on the business of the Policyholder.

It is hereby understood and agreed that the above Hazard shall be extended to include sojourn and personal deviation incidental to a covered business trip. (D.I. 16 Exhibit A.)

A federal common law of rights and obligations must be developed by federal courts to resolve disputes arising from ERISA regulated plans. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987). "[T]he validity of a claim for benefits under an ERISA plan will ordinarily rest upon the court's interpretation of the language of the plan at issue." *Cury v. Colonial Life Ins. Co.*, 737 F.Supp. 847, 853 (E.D.Pa. 1990) In addition to case law construing insurance policies, courts may rely upon

---

**6.** As stated *supra*, the parties have stipulated that McGrath, as an employee of ICI, would

meet the initial requirements of a Covered Person. (D.I. 16 at 3.)

traditional principles of contract interpretation to resolve issues. *Id.*

First ... [the court] must determine as a matter of law whether the contract provision at issue is ambiguous. *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir.1986). "[A]mbiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 n. 10 (3d Cir.1980). A contract is ambiguous if it (1) is reasonably susceptible to different constructions; (2) is obscure in meaning through indefiniteness of expression; or (3) has a double meaning. (citation omitted) *Cury v. Colonial Life Ins. Co.*, 737 F.Supp. 847, 853 (E.D.Pa.1990).

In addition,

Because "ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans," federal courts must fashion a federal common law to regulate such lawsuits.... In so doing, a federal court may borrow "from state law where appropriate, and [may be] guided by the policies expressed in ERISA and other federal labor laws".... *Reid v. Prudential Ins. Co.*, 755 F.Supp. 372 (M.D.Fla.1990).

Applying the principles set forth above, this Court adopts the maxim of interpretation stated by the Delaware Supreme Court and adhered to by most courts that if the language of an insurance policy is clear and unequivocal:

a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented [citations omitted] *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A 2d 925 (Del.1982).

In the present case, this Court finds as a matter of law that there is no ambiguity concerning the language of the policy. As plaintiff states in her brief in opposition to defendant's motion for summary judgment

the only question presented in this case concerns the "interpretation of the facts relevant to the policy language" and in particular whether "Mr. McGrath's activities were encompassed by the policy definition for bonafide [sic] business trip." (D.I. 18 at 2.) The policy definition itself is clear and unambiguous, and thus the parties will be bound by its plain meaning.

Crucial to the disposition of this case is the fact that the Home Insurance Policy limits coverage by specifically defining the requirement of "on the business of the Policyholder" in an exceedingly narrow fashion. The policy states in relevant part: "The term 'while on the business of the Policyholder' means while *on assignment by or at the direction of the Policyholder* for the purpose of furthering the business of the Policyholder." (Emphasis added.)

The policy's use of the conjunction "and" with the requirements of "on the business of the Policyholder *and* during the course of any bonafide [sic] business trip" denotes that no coverage exists unless both requirements are met. Since "on the business of the Policyholder" is specifically defined and mandates that a Covered Person be *on assignment by or at the direction of the Policyholder*, there can be no coverage unless that last requirement is met in all circumstances. Thus, unless plaintiff offered evidence from which a reasonable jury could conclude that plaintiff's husband was *on assignment by or at the direction of* ICI at the time of his death, plaintiff's claim must fail as a matter of law.

The evidence that Keith McGrath was not *on assignment by or at the direction of the Policyholder* on the day of the bikeathon is uncontroverted. First, there is the testimony of McKay, McGrath's supervisor, that McGrath was not on assignment and had never requested approval for business travel. Second, there is the deposition testimony of team organizer, Richard Brown, that he, Brown, had no authority over McGrath; that he, Brown, did not perceive the bikeathon as a business-related activity; and that McGrath had never indicated to him that anyone at ICI had told McGrath to ride in the bikeathon. (D.I. 19

Exhibit A at 20.) Third, there is the deposition testimony of John Moore, another ICI employee who rode in the bikeathon, that no one at ICI told Moore that he had to ride in the bikeathon; (D.I. 16 Exhibit G at 6–7) that he, Moore, did not ask authorization of his supervisor to ride; and that he, Moore, in no way felt that he was involved in the business of ICI when he rode, but rather, considered the ride to be a personal endeavor. (*Id.* at 9–10.)

Finally, there is the deposition testimony of the plaintiff, Katherine McGrath, which states that her husband was contacted concerning the event by Richard Brown, who had no supervisory authority over him; that while it was her opinion that her husband had felt a moral obligation to ride in the bikeathon because he was representing the ICI corporate team and because ICI had paid his fee, he nevertheless "wouldn't have been there if he didn't like to ride his bike"; and finally, that it was her understanding that her husband's participation was voluntary. (D.I. 19 Exhibit C at 12.)

In this case, even when all the inferences to be drawn from the underlying facts are viewed in a light most favorable to the plaintiff, the defendant is still entitled to a judgment in its favor as a matter of law. The most favorable inference that can be drawn for plaintiff is that when plaintiff's husband was riding in the bikeathon as part of the ICI corporate team he was somehow furthering the business of ICI in that he was aiding the corporation in improving its image through charitable activity. However, even if a finder of fact were to so view the evidence, such evidence standing alone, is insufficient as a matter of law to support a judgment that plaintiff's husband was covered by the section of the Home Insurance policy at issue on the day of the bikeathon. Such evidence is insufficient because under the language of

the Home Insurance policy a Covered Person could be furthering the business of his employer and still not be entitled to coverage.

Despite the fact that the parties have spent a considerable amount of time arguing whether or not McGrath was furthering the business of ICI at the time of his death, furthering the business of the employer is not the activity which triggers coverage. The *sine qua non* of coverage under the Home Insurance policy is that the covered person must be injured while *on assignment by or at the direction of the Policyholder.* The undisputed material facts in this case are insufficient as a matter of law to allow a reasonable jury to make such a finding. Not only is there a substantial amount of uncontroverted evidence that Keith McGrath was neither on assignment nor acting by or at the direction of anyone at ICI, but there, in fact, has been no evidence offered by plaintiff to support a contrary conclusion. Since this Court concludes that the injury must occur while the covered person is *on assignment by or at the direction of the Policyholder,* this Court finds that plaintiff's claim cannot be sustained as a matter of law.[7]

## V. CONCLUSION

For the reasons stated above, this Court will grant summary judgment to defendant, the Home Insurance Company. An order will be entered forthwith in accordance with this opinion.

---

**7.** Plaintiff has also suggested that "[a]n analogy can be drawn to workers' compensation law when an employee is injured in an event sponsored by his employer and where the employer derives some benefit from the sponsorship of the event. The basic inquiry is whether the event is sufficiently related to the employment to justify the conclusion that *the injury rose [sic] out of and in the course of employment.*" (D.I. 18 at 13.) (Emphasis added.) However, since this Court has found that the basic inquiry in the case at hand is not whether the injury *arose out of and in the course of employment* but rather whether the injury occurred while the covered person was *on assignment by or at the direction of the Policyholder,* this Court finds the worker's compensation analogy to be inapposite.