**Jay DOROSHOW, Appellant,**

v.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY.**

No. 08–2836.

United States Court of Appeals,
Third Circuit.

Argued on Feb. 3, 2009.

Opinion Filed: July 30, 2009.

resolution of this issue would not affect our          decision here, we leave it for another day.

Scott I. Fegley, Esquire (Argued), Yardley, PA, for Appellant.

Brian P. Downey, Esquire (Argued), Pepper Hamilton, LLP, Harrisburg, PA, Stacey I. Gregory, Esquire, Pepper Hamilton, LLP, Philadelphia, PA, for Appellee.

Before: RENDELL, JORDAN and ROTH, Circuit Judges.

## OPINION

ROTH, Circuit Judge:

Jay Doroshow appeals the District Court order granting summary judgment in favor of Hartford Life and Accident Insurance Company. The District Court found that Hartford had not been arbitrary and capricious in its decision to deny long term disability benefits to Doroshow under an employee welfare benefit plan, governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. For the following reasons, we will affirm that decision.

## I. *Background*

Doroshow was an employee of the CVS Corporation and participated in its Long Term Disability Income Insurance Plan, a group benefit plan issued by Hartford. CVS "delegated sole discretionary authority to Hartford ... to determine [the participant's] eligibility for benefits and to interpret the terms and provisions of the plan and any policy issued in connection with it."

Doroshow's effective date of coverage was July 1, 2006. Under the plan, long term disability benefits are not payable for disabilities "caused by, contributed to, or resulting from ... a preexisting condition." A pre-existing condition is one "for which medical treatment or advice was rendered, prescribed or recommended within 12 months (3 months for exempt employees) prior to [the participant's] effective date of insurance." It is undisput-

ed that Doroshow was subject to the three-month look-back period.

Doroshow was diagnosed definitively with Amyotropic Lateral Sclerosis (ALS) on March 15, 2007. On March 16, 2007, Doroshow applied for disability benefits under the Hartford plan. Hartford denied Doroshow's claim on August 30, 2007, writing:

> Our review of all of the medical information in your claim file shows that you are claiming benefits because of symptoms related to motor neuron disease (MND), which includes amyotrophic lateral sclerosis (ALS). The medical records obtained from the office of Dr. Goldstein indicate that you were treated for this condition on 05/16/2006. ALS was discussed in this OV, likely due to the type of symptoms you were experiencing and the family history of this disease. Intermittent workup and follow up continued for your reported symptoms until definitive diagnosis was reached in March 2007. You were provided advice related to the possibility of an ALS diagnosis on 05/16/2006, and the symptoms were certainly a precursor to the eventual diagnosis of ALS. This treatment date falls within the 3 month period that ends before your effective date of LTD coverage. This information shows that your condition was Preexisting.

The office visit with Dr. Arnold Goldstein, M.D., Doroshow's primary care physician, to which Hartford referred in its denial letter, occurred on May 16, 2006, during the look-back period. Hartford's denial relied on Dr. Goldstein's office notes, in which he wrote, "Motor neuron disease. Lumbrosacral plexitis is the most recent diagnosis. Was not felt to be ALS." Hartford determined that during this office visit Dr. Goldstein had rendered advice pertaining to ALS, thus making Doroshow ineligible for long-term disabili-

ty benefits under the pre-existing condition plan exclusion.

Even prior to the Dr. Goldstein visit during the look-back period, Doroshow's medical records indicate he had received advice and undergone testing related to ALS based on symptoms he was experiencing and a family history of the disease. On July 25, 2005, Dr. Mark J. Brown, M.D., a neurologist, conducted an electromyographic (EMG) test on Doroshow. In Dr. Brown's notes, he wrote: "1. Chronic active degeneration of right leg, arm, paraspinal and bulbar muscles with near-normal nerve conduction studies. These are features of a motor neuron disease. 2. If the left Babinksi sign is a consistent feature then he has the ALS form of motor neuron disease."

Following this test, Doroshow visited Leo McCluskey, M.D., an ALS specialist, on July 27, 2005. Dr. McCluskey wrote that "Doroshow demonstrates evidence of a lower motor neuron process affecting his right leg" and that "[h]e has no upper motor neuron signs." Accordingly, Dr. McCluskey felt that "[t]hese are features that do not support the diagnosis of amyotropic lateral sclerosis or a progressive motor neuron disorder." Doroshow was under Dr. McCluskey's treatment for motor neuron disease between April 1, 2000, and June 30, 2006. Dr. McCluskey was ultimately the doctor who diagnosed Doroshow with ALS on May 15, 2007.

After he unsuccessfully appealed Hartford's decision via its internal administrative procedures, Doroshow filed an action in the District Court pursuant to 29 U.S.C. § 1132(a)(1)(B). He claimed that Hartford's denial was arbitrary and capricious. Both parties subsequently filed motions for summary judgment. The District Court determined that Doroshow had not demonstrated that Hartford's decision was arbi-

trary and capricious and granted judgment for Hartford. Doroshow appealed.

## II. *Standard of Review*

We have jurisdiction over this appeal under 28 U.S.C. § 1291 and exercise plenary review over the District Court's decision to grant summary judgment. Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

## III. *Discussion*

█ Before addressing the merits of Doroshow's appeal, we must first determine what standard of review a trial court must apply in 29 U.S.C. § 1132(a)(1)(B) actions. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. 948. When the administrator has discretionary authority to determine eligibility for benefits, as Hartford did in this case, the decision must be reviewed under an arbitrary and capricious standard. Under that standard, "if a benefit plan gives discretion to an administrator or a fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.*

Until recently, this Circuit had used a sliding scale approach to address conflicts of interest and their impact on the amount of discretion that should be afforded to the decisions of plan administrators. *See Estate of Schwing v. The Lilly Health Plan,* 562 F.3d 522, 525 (3rd Cir.2009). Under the sliding scale approach, "if the level of conflict is slight, most of the administrator's deference remains intact, and the court applies something similar to traditional arbitrary and capricious review; conversely, if the level of conflict is high, then most of its discretion is stripped away." *Post v. Hartford Ins. Co.,* 501 F.3d 154, 161 (3d Cir.2007). In *Pinto v. Reliance Std. Life Ins. Co.,* 214 F.3d 377 (3d Cir.2000), we said, "an insurance company [that] both funds and administers benefits . . . is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." *Id.* at 378. Under the heightened version of this form of review, a court should be "deferential, but not absolutely deferential" to the administrator. *Id.* at 393. The District Court, following *Pinto,* used a heightened arbitrary and capricious standard to review Hartford's rejection of Doroshow's claim for benefits because Hartford both funded the plan and was solely responsible for determining eligibility under the plan.

In making its determination, the District Court did not have the benefit of *Metropolitan Life Ins. Co. v. Glenn,* —— U.S. ——, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), in which the Supreme Court rejected a conflict of interest review that requires a heightened arbitrary and capricious standard. In *Glenn,* a participant in a long-term disability insurance plan administered by Metropolitan Life Insurance Company (MetLife) challenged MetLife's determination that she was no longer eligible for benefits because she was not totally disabled. MetLife both funded the plan and had discretionary authority to determine the validity of an employee's benefits claim, creating the same type of conflict of

interest that we found in *Pinto* and that we have in this case.

■ With *Glenn*, the Court aimed to elucidate its previous precedent in *Firestone* that a conflict should be weighed as a factor in determining whether there is an abuse of discretion. *Glenn*, 128 S.Ct. at 2350. In doing so, the Court emphasized that the existence of a conflict did not change the standard of review from abuse of discretion to a more searching review. *Id.* at 2351. The Court explained that any one factor could act as a tiebreaker when the other factors are closely balanced. The greater "the tiebreaking factor's inherent or case-specific importance[,]" the less closely the other factors must be balanced for that tiebreaking factor to be decisive. *Glenn*, 128 S.Ct. at 2351. The Court provided an example:

> The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.*

The Court in *Glenn* reiterated its position in *Firestone* that a reviewing court should consider the conflict of interest—but only as one consideration among many. *Id.* Insofar as *Glenn* implicitly overrules and conflicts with our precedent, requiring courts to apply a *heightened* arbitrary and capricious review, we will apply the *Glenn* abuse of discretion standard where a conflict of interest exists.

■ Next we turn to the merits of Doroshow's appeal in the context of *Glenn*.[1] Under a traditional arbitrary and capricious review, a court can overturn the decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law. *See Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir.1993). The scope of this review is narrow, and "the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Id.* (internal quotation marks omitted).

The parties' dispute centers around Hartford's interpretation of the word "advice" in the insurance contract, which defines a pre-existing condition as "a condition for which medical treatment or advice was rendered, prescribed or recommended within 12 months (3 months for exempt employees) prior to *Your* effective date of insurance." Because the contract provided no definition of advice, the District Court turned to the ordinary meaning of the term, "an opinion or recommendation offered as a guide to action." *The Random House College Dictionary* 20 (Laurence Urdang et al. eds., 1973).

Using this definition, the District Court determined that Hartford was reasonable in finding that Doroshow received advice regarding ALS during the look-back period. Hartford, in rejecting Doroshow's claim, pointed to the notes of Dr. Goldstein

---

1. Because the District Court applied the heightened review standard, which was more favorable to Doroshow than the new standard, we find no prejudice in our considering Doroshow's appeal using the *Glenn* standard without remanding.

from an office visit Doroshow had on May 16, 2006, in which Dr. Goldstein wrote, "Motor neuron disease. Lumbrosacral plexitis is the most recent diagnosis. Was not felt to be ALS." The District Court wrote:

> By stating his opinion that the motor neuron disease afflicting his patient was not ALS but rather lumbrosacral plexitis, Dr. Goldstein rendered an opinion about ALS during the three months prior to the effective date of coverage. Advice is a broader concept than treatment, and a doctor's conclusion that a patient is not suffering from a certain condition constitutes an opinion or recommendation offered as a guide to action.

*Doroshow v. Hartford Life & Acc. Ins. Co.,* 560 F.Supp.2d 392, 400 (E.D.Pa.2008).

Though we do not find generally that ruling out a condition constitutes advice or treatment for that condition, we find Dr. Goldstein's notes related to ALS particularly compelling in the broader context of Doroshow's entire medical history. As early as 2005, ALS was considered as a possible diagnosis for the range of symptoms Doroshow had experienced. Dr. Brown noted that an EMG performed on Doroshow showed signs of a motor neuron disease and possibly ALS. As a result of this test, and Doroshow's family history of ALS, Dr. Brown suggested Doroshow see an ALS specialist. This specialist, Dr. McCluskey, found signs of a motor neuron disease but did not diagnose Doroshow with ALS. Because two doctors before Dr. Goldstein considered ALS as, at least, a possible explanation for his symptoms, we find Hartford's determination that Doroshow received advice pertaining to ALS specifically during the look-back period was reasonable.

We note, as the District Court did, that ALS is the most common form of motor neuron disease. Because of the inexorable, progressive nature of the disease, it is not surprising that, when Doroshow first began exhibiting symptoms, the doctors did not conclusively determine that he had ALS, but more generally said only that he had a form of motor neuron disease. From the record and Doroshow's family history of ALS, however, it seems that a diagnosis of ALS was repeatedly considered after he began showing symptoms of a motor neuron disease.

Doroshow, in support of his position that the "ruling out" of a condition cannot constitute advice, cites two of our cases, *McLeod v. Hartford Life & Acc. Ins. Co.,* 372 F.3d 618 (3d Cir.2004), and *Lawson ex rel. Lawson v. Fortis Ins. Co.,* 301 F.3d 159 (3d Cir.2002).[2] In *McLeod,* an employee was denied long-term disability benefits because of the alleged pre-existence of multiple sclerosis. He had sought treatment during the look-back period for a variety of non-specific symptoms and was treated for a host of ailments, but during this period, neither the employee nor his doctors suspected multiple sclerosis. We found that Hartford's denial was arbitrary and capricious and held that seeking medical care for a symptom of a pre-existing condition can serve as a basis for denying coverage when there is some "intent to treat or uncover the particular ailment which causes that symptom (even absent a timely diagnosis), rather than some nebulous or unspecified medical problem." *McLeod,* 372 F.3d at 628.

In reaching this result in *McLeod,* we cited *Lawson,* in which we explained the difference between a "suspected condition without a confirmatory diagnosis" and "a

---

**2.** Doroshow cites a number of other cases that are not binding on this Court; we will

not address those since they have no bearing on how we should rule in this case.

misdiagnosis or an unsuspected condition manifesting non-specific symptoms." *Lawson,* 301 F.3d at 166. We wrote:

When a patient seeks advice for a sickness with a specific concern in mind (*e.g.* a thyroid lump, as in *McWilliams [v. Capital Telecomms. Inc.,* 986 F.Supp. 920 (M.D.Pa.1997) ], or a breast lump, as in *Bullwinkel [v. New England Mutual Life Ins. Co.,* 18 F.3d 429 (7th Cir. 1994) ]) or when a physician recommends treatment with a specific concern in mind (*e.g.,* a "likely" case of multiple sclerosis, as in *Cury [v. Colonial Life Ins. Co. of Am.,* 737 F.Supp. 847 (E.D.Pa.1990) ]), it can be argued that an intent to seek or provide treatment or advice "for" a particular disease has been manifested. But when the patient exhibits only non-specific symptoms and neither the patient nor the physician has a particular concern in mind, or when the patient turns out not to have a suspected disease, it is awkward at best to suggest that the patient sought or received treatment for the disease because there is no connection between the treatment or advice received and the sickness.

*Id.* In *Lawson,* the patient was ultimately diagnosed with leukemia, but the insurance company based its denial of the benefits claim on an office visit during the look-back period in which the patient was treated for a respiratory tract infection. It was clear from the record that neither the patient's doctor or her parents ever considered leukemia as a possible diagnosis. Accordingly, we found the patient had not received medical advice or treatment for leukemia and could not be denied coverage because of a pre-existing condition. *Id.*

Doroshow suggests both *McLeod* and *Lawson* support his position that he had not received any advice related to ALS during the look-back period. The implica-

tion from his argument is that he falls into the category of "a misdiagnosis or an unsuspected condition manifesting non-specific symptoms," which under both *McLeod* and *Lawson* would not be demonstrative of a pre-existing condition. Contrary to Doroshow's claims, however, the record plainly demonstrates otherwise. Based on his family history of ALS and his medical records, we conclude that it is clear that Doroshow sought advice for ALS when he visited Dr. Goldstein during the look-back period. Therefore, he had a "suspected condition without a confirmatory diagnosis," which may appropriately be deemed a pre-existing condition.

## IV. *Conclusion*

For the foregoing reasons, we will affirm the District Court's order granting Hartford's motion for summary judgment.

RENDELL, Circuit Judge, dissenting.

Jay Doroshow is entitled to benefits because he was neither given advice nor treated *for* ALS, prior to his diagnosis of that condition in March 2007—nearly one year after his doctor had not only diagnosed him with a *different* condition but had actually *rejected* a diagnosis of ALS. The majority's conclusion that his doctor's *negative* diagnosis of ALS during the relevant three-month period somehow renders his later-diagnosed ALS a "pre-existing condition" under Hartford's policy rests upon a seriously flawed reading—or total disregard—of the definition of this phrase provided in the Hartford policy, as well as two precedents of our court construing similar policy terms. *McLeod v. Hartford Life & Acc. Ins. Co.,* 372 F.3d 618 (3d Cir.2004); *Lawson ex rel. Lawson v. Fortis Ins. Co.,* 301 F.3d 159 (3d Cir.2002).

Hartford's policy defines "pre-existing condition" as "a condition for which medical treatment or advice was rendered, pre-

scribed, or recommended within 12 months (3 months for exempt employees) . . . prior to [the participant's] effective date of insurance." Critically, the policy does not say advice as to the *possibility* of ALS, as the Hartford Plan Administrator reasoned; advice *about* ALS, as the District Court loosely reasoned; or advice *relating* to or *pertaining* to ALS, as the majority seeks to paraphrase. Rather, determination of a pre-existing condition requires provision of advice or treatment *for* that condition, here ALS, in April, May, or June 2006.[3]

Construing "for" as synonymous with "relating" or "pertaining" to, the majority disregards not one, but two, binding precedents of our court interpreting nearly identical policy language. In *Lawson*, Elena Lawson was diagnosed, and received treatment, for an upper respiratory tract infection. *Lawson*, 301 F.3d at 161. After her symptoms persisted, however, doctors diagnosed her with leukemia, and concluded that her earlier symptoms stemmed from that condition. Lawson's insurance policy defined "pre-existing condition" as a "Sickness, Injury, disease or physical condition for which medical advice or treatment was recommended by a Physician or received from a Physician . . . ." *Id.* Determining that Lawson's leukemia was a preexisting condition, the insurer denied her claim. Reversing, the District concluded, "[I]n order to be treated for leukemia, there must have been some awareness that the disease existed at the time treatment or advice was rendered." *Id.* at 162. We affirmed, holding that the word "for" "connotes intent." *Id.* at 165. We reasoned—

quite correctly—that "it is hard to see how a doctor can provide treatment 'for' a condition without knowing what that condition is . . . ." *Id.* Providing advice or treatment for the symptoms of a later-diagnosed condition, we emphasized, does not constitute treatment *for* that condition. In rejecting an expansive definition of "for," we explained:

> Although we base our decision on the language of the policy, we note that considering treatment for symptoms of a not-yet-diagnosed condition as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during the exclusionary period. To permit such backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial.

*Id.* at 166 (internal citation omitted).

I submit that the majority here has fallen into this very trap by essentially concluding that, because Doroshow likely had ALS all along, ALS was a "pre-existing condition."[4] In so reasoning, the majority does a disservice to the policy language, to our precedent in *Lawson*, and to Doroshow himself.

In a subsequent opinion, *McLeod*, we went even farther than in *Lawson*, opining that policy language defining preexisting condition as including *symptoms* for which

---

**3.** The parties agree that the "pre-existing condition" from which Doroshow suffered was ALS.

**4.** The majority, indeed, focuses on Doroshow's medical history, including the initial suspicion of one of his doctors—*prior* to the three month look-back period—that Doro-

show suffered from ALS. But Hartford's own definition of 'pre-existing' as it applies to Doroshow means during the three months before July 1, 2006. As discussed below, during that three-month period Doroshow's doctor rejected the ALS diagnosis in favor of a diagnosis of lumbosacral plexitis.

the claimant received medical care also implied "some intention on the part of the physician or of the patient to treat or uncover the underlying condition which is causing the symptom." 372 F.3d at 628. As in *Lawson*, we distinguished a "suspected condition without a confirmatory diagnosis" and a "misdiagnosis." *Id.* at 628. Although the insurer in *McLeod* "placed great stock" in differences in its definition of pre-existing condition and that of the insurer in *Lawson*, we concluded that, when policy language requires that advice be "for" symptoms, "for" requires an "intent" to treat the symptoms of the *ultimately-diagnosed condition*. Accordingly, we reversed the District Court's determination that Hartford's denial of benefits was reasonable.

Today, the majority inexplicably casts these precedents aside, referring to their *dicta* without discussing their holdings. Instead, the majority concludes that Doroshow received advice for ALS, because ALS was a "suspected condition without a confirmatory diagnosis." However, to reach such a conclusion requires wholesale revision of Dr. Goldstein's note of May 16, 2006—the *only* evidence of diagnosis, treatment, or advice during the look-back period. The note does not identify ALS as a suspected condition. To the contrary, Dr. Goldstein indicated, "Lumbosacral plexitis is the most recent diagnosis. Was not felt to be ALS." Doroshow did receive a "confirmatory diagnosis" and advice— not for ALS, but for lumbosacral plexitis.

Jay Doroshow is now suffering from ALS. It was not diagnosed until March 15, 2007—ten months after his diagnosis of lumbosacral plexitis. Hartford's denial of coverage based on its view that ALS was a pre-existing condition was arbitrary and

capricious, not only because it contravened the definition of the term expressly provided in its policy, but also because this court has twice opined—indeed, once involving Hartford—that "for" connotes intent and is not synonymous with "related to" or "regarding."[5] Accordingly, I would reverse and remand for entry of an order requiring that benefits be paid to Jay Doroshow.

---

5. We have no difficulty concluding here, as we did in *McLeod*, that application of the "pre-existing condition" exclusion to Doro-

show's *later-diagnosed* condition was arbitrary and capricious.