**Edwin YOUNG, Appellant,**

v.

**AMERICAN INTERNATIONAL LIFE ASSURANCE COMPANY OF NEW YORK.**

**No. 08–4127.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Dec. 17, 2009.

Filed Dec. 18, 2009.

---

Gregory G. Paul, Esq., Equality At Work, Sewickley, PA, for Appellant.

Salvatore A. Clemente, Esq., Wilson, Elser, Moskowitz, Edelman & Dicker, Philadelphia, PA, for American International Life Assurance Company of New York.

Before: SLOVITER, JORDAN and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

JORDAN, Circuit Judge.

Edwin Young appeals from an order of the United States District Court for the Western District of Pennsylvania granting summary judgment to American Life Assurance Company of New York ("AI Life") on Young's claim for benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* ("ERISA"). For the following reasons, we will affirm.

## I. Background

Young, as a managing attorney for American International Group, Inc. ("AIG"), was an eligible participant under Group Disability Insurance Policy GLT–10761 (the "Policy"), an employee sponsored benefit program governed by ERISA and issued and insured by AI Life. On November 26, 2001, he experienced severe chest pains at work and was taken to the hospital. Tests revealed that Young did not suffer from a heart condition, which led his cardiologist, Dr. Dennis Eberz, to believe that the symptoms resulted from depression and stress that Young suffered in connection with his job.

On April 25, 2002, Young filed for longterm disability ("LTD") benefits under the Policy, alleging that he had been disabled since November 26, 2001.[1] In his LTD benefits claims form, Young reported that he was disabled due to "major depres-

---

1. A participant in the plan is entitled to receive LTD benefits if he becomes disabled, meaning that he is prevented "from performing one or more of the Essential Duties of [His] Occupation" as a result of accidental bodily injury, sickness, mental illness, substance abuse, or pregnancy, and consequently earns less than 80% of his pre-disability earnings. (Supp.App. at AMER0005.)

sion/panic disorder caused by stressful work environment/workload." (Supp.App. at AMER0794.) The physician's portion of the LTD benefits claims form, filled out by Dr. Eberz, similarly reported a diagnosis of "major depression/panic disorder." (Supp.App. at AMER0788–89.) Young's application also included a letter from his psychiatrist indicating that Young was receiving treatment for major depressive disorder. AI Life determined that Young was eligible for LTD benefits and informed Young that he would begin receiving those benefits on May 28, 2002, pursuant to the mental illness and substance abuse provision of the Policy. In contrast to benefits for physical disability, the Policy's mental illness and substance abuse provision limited LTD benefits for mental illness, including physical manifestations of mental illness, to a twenty-four month period. Accordingly, Young's benefits would expire on May 27, 2004.

In 2003, while receiving benefits under the Policy, Young applied for Social Security Disability benefits, describing his condition as "severe clinical depression—unable to focus or concentrate." (Supp.App. at AMER0705.) The Social Security Administration awarded Young benefits on January 25, 2004, based on its determination that he had become disabled on November 26, 2001.

Just prior to the expiration of his benefits under the Policy, Young notified the individual at AI Life who was handling his claim (the "claims administrator") that his disability was ongoing, and he requested information to challenge the upcoming expiration of his LTD benefits. On July 1, 2004, Dr. Eberz wrote a letter on Young's behalf stating "I do not understand the division between the mental and physical illness and do believe that [the termination of Young's LTD benefits] is discriminating against patients with mental illness." (Supp.App. at AMER0619.) The doctor further noted that, in addition to mental illness, Young suffered from physical symptoms associated with work-related stress such as chest pain and gastroesophageal reflux. Relying on this letter, Young, in an August 4, 2004 letter to an AI Life affiliate, asserted for the first time that his disability was "physical in nature" and thus not subject to the Policy's two-year limit on LTD benefits for mental disability.[2] (Supp.App. at AMER0618.)

Thereafter, AI Life requested Young's medical records to determine whether he in fact suffered from a physical disability. Once the records were received, the claims administrator sought an independent medical review by Dr. Rose Ho, a Board Certified physician in physical medicine and rehabilitation. In connection with her review, Dr. Ho consulted with Dr. Eberz. Dr. Ho reported that Dr. Eberz "ruled out [Young] for any cardiac problems" and "did not feel that [Young's] physical condition rose to a level in which he would be physically impaired," but rather that Young was "severely limited secondary to depression and adynamic mood." (Supp. App. at AMER0512.) In a February 1, 2005 report, Dr. Ho acknowledged Young's diagnoses of depression, panic disorder, carpal tunnel syndrome, a possible rotator cuff tear, arthritis, joint arthritis and asthma. She concluded however, that, based on Young's medical records and her discussion with Dr. Eberz, Young's physical conditions did not rise to the level of a physical disability. In a March 14, 2005

---

**2.** The letter is addressed to "AIG Life Companies (U.S.), Appeals Unit," and says, among other things, "I do believe that the two year limitation for mental disability is highly discriminatory and would not be received favorably by the courts...." (Supp.App. at AMER0618.) Thus, despite his claim of a physical disability, Young continued to advocate his case as if it were based on a mental disability.

letter, the claims administrator denied Young's request for benefits because his disability "was a result of a mental illness" and because his physical conditions did not equate to a physical disability. (Supp.App. at AMER0497–99.)

Young appealed that decision and sent AI Life additional information relevant to his claim, including a September 20, 2005 letter from Dr. Eberz in which Dr. Eberz identified several of Young's physical conditions—among them chest pain, asthmatic bronchitis, and gastroesophageal reflux— and opined that Young would suffer a "medically unacceptable risk" of disability in cardiac, gastrointestinal, and respiratory functions if he returned to work. (Supp. App. at AMER 0471.) Young also sent an affidavit in which he attested that he was physically incapable of continuing in his occupation [3] due to his rotator cuff injury, asthmatic bronchitis, carpal tunnel syndrome, and cardiac symptoms. Upon review of the file, including that additional information, the claims administrator upheld the denial of benefits.

Young appealed again. Upon receiving Young's up-to-date medical records, the claims administrator arranged for another independent medical review, this one conducted by Dr. Robert L. Marks, a Board Certified physician in physical medicine and rehabilitation and neurology. In addition to reviewing Young's medical records, Dr. Marks spoke with Dr. Eberz, who stated that when he last saw Young, on June 28, 2005 (eighteen months prior), he found no major cardiac abnormalities despite Young's complaints of chest pain. Dr. Eberz believed that the chest pain was likely related to gastroesophageal reflux disease. Importantly, Dr. Eberz also "indicated that he did not believe that [Young's] physical condition was of a mag-

nitude to preclude return to work." (Supp.App. at AMER0185, 189.) Dr. Marks also spoke with Young's physiatrist, Dr. Henderson, who also stated that Young was "sufficiently functional to be able to work." (Supp.App. at AMER0185, 192.) Both doctors returned letters to Dr. Marks certifying Marks's rendition of their conversations.

In a January 19, 2007 report, Dr. Marks concluded that Young was able to physically perform his job as of November 27, 2001 with some limitations—wrist splints, changes in position, and file carriers—to accommodate his shoulder problem and carpal tunnel syndrome. Dr. Marks further noted that most of those limitations "are actually recommendations for asymptomatic individuals in an otherwise 'normal' work situation." (Supp.App. at AMER0187.) Dr. Marks's report was based on his discussions with Young's treating physicians and a review of Young's entire file.

Upon review of Dr. Marks's report, the claims administrator sent Young's file to a rehabilitation case manager to determine whether Young could perform his occupation. The rehabilitation case manager concluded that, based on Dr. Marks's report, Young could physically perform his occupation, a sedentary level job in the national economy, with the accommodations identified by Dr. Marks. Based on a review of Young's file, including Dr. Marks's report and the rehabilitation case manager's conclusions, the claims administrator upheld the determination that Young was not entitled to benefits for physical disability.

Having exhausted his administrative remedies, Young filed this lawsuit pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B), to recover benefits under the Policy. The

---

**3.** The Policy defines "Your Occupation" as "your occupation as it is recognized in the general workplace. Your occupation does not mean the specific job you are performing for a specific employer or at a specific location." (Supp.App. at AMER0009.)

parties filed cross-motions for summary judgment. In analyzing Young's claim, the District Court applied a "moderately heightened [arbitrary and capricious] standard of review, at the lower end of the sliding scale" finding that a conflict of interest existed because "the entity funding the plan ... also made the final decision regarding eligibility." *Young v. Am. Int'l Life Assurance Co. of N.Y.,* Civ. A. No. 07–626, 2008 WL 4155082, at *6 (W.D.Pa. Sept. 9, 2008). Turning to the merits of Young's claim, the District Court held that AI Life's denial of benefits was not arbitrary and capricious under that standard and, accordingly, issued an order granting summary judgment to AI Life and against Young. *Id.* at **6–8. Young timely appealed.

## II. Discussion[4]

We exercise plenary review over an appeal from a grant of summary judgment. *Jacobs Constructors, Inc. v. NPS Energy Servs., Inc.,* 264 F.3d 365, 369 (3d Cir. 2001). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* (*citing* FED. R.CIV.P. 56(c)). "In making this determination, we must consider the evidence in the record in the light most favorable to the nonmoving party." *Id.*

### A. *ERISA Standard of Review*

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If a plan gives the administrator discretion, we review the administrator's decisions under an arbitrary and capricious standard. *Doroshow v. Hartford Life and Acc. Ins. Co.,* 574 F.3d 230, 233 (3d Cir.2009). We had previously adopted a heightened form of arbitrary and capricious review for those cases in which an administrator acts under a conflict of interest, using a "sliding scale" approach to address how much deference should properly be afforded to a conflicted administrator's determination. *See Post v. Hartford Ins. Co.,* 501 F.3d 154, 161 (3d Cir.2007). In the wake of the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), however, our sliding scale approach is no longer tenable. *Estate of Schwing v. The Lilly Health Plan,* 562 F.3d 522, 525 (3d Cir. 2009). Nevertheless, conflicts of interest remain a factor that courts must consider in evaluating whether an administrator's denial of benefits is arbitrary and capricious. *Id.* at 526.

The Policy clearly gives AI Life the kind of discretion that triggers an arbitrary and capricious standard of review.[5] (*See* Supp. App. at AMER0–024 ("AI Life Assurance Company of New York has full discretion and authority to determine eligibility for benefits and to construe and interpret all

---

**4.** The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). Our jurisdiction arises under 28 U.S.C. § 1291.

**5.** Young does not claim that AI Life lacks discretion to determine benefits under the Policy. Instead, Young argues that the fact that AI Life abused its discretion by failing to consider "all of the probative and relevant

evidence in the administrative record" requires us to apply a *de novo* standard of review. (Appellant's Op. Br. at 19.) In other words, because AI Life abused its discretion, argues Young, AI Life is not entitled to the benefit of the arbitrary and capricious standard but should be penalized with a *de novo* standard of review. Young cites no law in support of his novel theory.

terms and provisions of the Group Insurance Policy.").) Unfortunately, the District Court did not have the benefit of our opinion in *Estate of Schwing*,[6] which issued months after the District Court ruled on the parties' motions, so the Court analyzed Young's claim under the sliding scale approach, determining that a "moderately heightened standard of review, at the lower end of the sliding scale" was appropriate because of a financial conflict, since the insurer of the Policy also acted as a decision-maker on benefits coverage.[7] *Young*, 2008 WL 4155082, at *6. Because we no longer use the sliding scale approach, we will apply an unmodified arbitrary and capricious review to AI Life's decision, but in doing so, we will take into account the admitted financial conflict as one factor in our analysis. *See Glenn*, 128 S.Ct. at 2351 ("[C]onflicts are but one factor among many that a reviewing judge must take into account."). "Under a traditional arbitrary and capricious review, a court can overturn the decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Doroshow*, 574 F.3d at 234.

### B. AI Life Did Not Abuse Its Discretion in Denying Young Benefits

As to the merits of his claim, Young contends that AI Life's determination that he was not physically disabled is arbitrary and capricious because it is contradicted by Dr. Eberz's September 20, 2005 letter, as well as being unsupported by the record. Specifically, Young relies on Dr. Eberz's statements that Young "definitely suffers a risk of disability were he to go back to work and that disability could occur either in the cardiac area, gastrointestinal area and from the respiratory standpoint as well," and that "there is a medically unacceptable risk for Mr. Young to go back to work from the standpoint of perhaps even a myocardial infarction or other such calamity in the other areas outlined above." (Supp. App. at AMER0471.) The doctor's comments, however, have been seriously undermined and will not bear the weight Young puts on them.

First, Dr. Eberz's statement that Young's physical conditions presented "a medically unacceptable risk [if Young went] back to work from the standpoint of perhaps even a myocardial infarction [i.e., a heart attack]" is flatly contradicted by his discussions with Drs. Ho and Marks in which he acknowledged that Young could indeed return to work. Further, Dr. Eberz's own records—which indicate normal stress tests and EKGs and no physical abnormalities—contradict the notion that Young is physically disabled due to a heart condition or that Young might suffer a heart attack should he return to work. In fact, Dr. Eberz has indicated on more than one occasion that Young's chest pain resulted from gastroesophageal reflux disease, apparently caused by mental stress. The doctors treating Young for other physical symptoms, such as carpal tunnel syndrome and shoulder pain, did not indicate that Young was physically disabled due to those conditions, nor do their records suggest that Young's conditions render him physically disabled. Given the lack of medical evidence suggesting physical disability and the adequately supported opinions of Drs. Ho and Marks, AI Life did not abuse its discretion in disregarding Dr. Eberz's unsupported disability conclu-

---

6. The District Court also did not mention *Glenn*, which issued very shortly before the Court ruled on the parties' motions.

7. AI Life concedes, as it did before the District Court, that a financial conflict of interest exists in this case. *Young*, 2008 WL 4155082, at *5.

sion, which contradicts his own statements and records.[8] *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians."); *Stratton v. E.I. DuPont De Nemours & Co.,* 363 F.3d 250, 258 (3d Cir.2004) ("A professional disagreement does not amount to an arbitrary refusal to credit."). Furthermore, since the case before us is clear, the conflict of interest identified by the District Court does not tip the scales in favor of Young, especially since there is no indication that the conflict affected AI Life's decision. *See Glenn,* 128 S.Ct. at 2351 (noting that a conflict of interest "will act as a tiebreaker when other factors are closely balanced" and "should prove more important ... where circumstances suggest a higher likelihood that it affected the benefits decision").

Young relies heavily on *Lasser v. Reliance Standard Life Insurance Co.,* 344 F.3d 381 (3d Cir.2003) in support of his argument that AI Life acted arbitrarily and capriciously by disregarding the unacceptable medical risk identified by Dr. Eberz, but *Lasser* is distinguishable. Unlike Young, the claimant in *Lasser* suffered from a well-documented heart condition.[9]

344 F.3d at 383 (noting that the plaintiff "suffers from coronary artery disease"). Furthermore, in *Lasser,* we held that the administrator's decision was arbitrary and capricious because "all evaluating physicians [including two doctors engaged by the administrator]—with the exception of [one doctor] whose report the others discredited—agreed that [the plaintiff's] heart condition precludes him from safely performing [the duties of his job]." *Id.* at 391. In contrast, the evidence in this case strongly suggests that Young can perform his job without risking physical injury. Although occupational stress might have been hazardous to Young's mental condition, it was not arbitrary and capricious for AI Life to conclude that Young could physically work at his occupation and handle work-related stress. Furthermore, we cannot overlook the fact that Young consistently characterized his disability as depression—both in his LTD benefits claim form and his application for social security benefits—and only changed his position when he realized that his benefits had been exhausted under the Policy's mental illness provision.

Young also argues that AI Life's reliance on Dr. Marks's opinion was arbitrary and capricious because Dr. Marks noted

---

**8.** Young's assertions that AI Life failed to consider Dr. Eberz's letter are meritless. The claims administrator explicitly identified the letter as among the items reviewed in connection with the denial of Young's first appeal, but rejected Dr. Eberz's conclusions as unsupported by objective findings. The mere fact that neither Dr. Marks's report nor the claims administrator's final letter denying Young's second appeal specifically referenced Dr. Eberz's letter, when it is clear that both Marks and the claims administrator reviewed Young's entire file in determining Young's disability status, does not require us to find in Young's favor, especially in light of Dr. Eberz's change in position. Young also argues that it is not clear whether Dr. Eberz's statement to Dr. Marks, that Young could

physically work, referred to work in Young's own occupation or "work in general" such as "part-time unskilled work." (Appellant's Op. Br. at 21.) Even assuming that Dr. Eberz's statement could be given the meaning Young attributes to it, Dr. Marks clearly understood Young's position, and the conclusions in his report, which were reached in light of that understanding, are sufficiently supported by the medical record.

**9.** Likewise, *Hoover v. Provident Life and Accidental Insurance Co.,* on which Young also relies, concerned a claimant suffering from a heart condition: coronary artery disease with stress-induced angina. *290 F.3d 801, 803* (6th Cir.2002).

Young would need some accommodations to return to work but the Plan's definition of "disability" does not account for reasonable accommodations or limitations. AI Life responds that the Policy speaks in terms of "essential duties," defined by the Policy as, among other things, "a duty that . . . can not be reasonably omitted or changed." (Supp.App. at AMER0006.) This language, AI Life argues, "exemplifies a modification provision, which implicates reasonable ·workplace accommodations," thereby permitting AI Life to take reasonable accommodations into account in determining whether a claimant can perform the essential duties of his job. (Appellees' Answering Br. at 49.)

Dr. Marks concluded that Young "should have been able to physically perform the duties of his work, but with some limitations," namely, avoiding heavy lifting, changing position every forty-five minutes, and using a wrist splint to assist with writing, typing, and using the phone. (Supp.App. at AMER0186.) To the extent that carrying files and typing would be difficult for Young due to his shoulder problem and carpal tunnel syndrome, it is clear that the effects of those tasks can be ameliorated by allowing Young to use wrist splints and devices, such as a wheeled briefcase, to facilitate the transfer of large files.[10] Thus, while Dr. Marks may have incorporated limitations into his analysis, he was simply doing what was required under the Policy by outlining the manner in which Young was capable of physically performing the essential duties of his job. AI Life did not abuse its discretion in relying on Dr. Marks's report because it could reasonably conclude that the aspects of the job with which Young might struggle could be addressed by adopting the suggested limitations, most of which would be recommended even "for asymptomatic individuals in an otherwise 'normal' work situation." (Supp.App. at AMER0187.) Simply because Dr. Marks did not use language that tracks the Policy does not mean that AI Life abused its discretion.

Furthermore, the Policy dictates that benefits will be terminated if a claimant "refuses to cooperate with or try . . . modifications made to the work site or job process to accommodate [the claimant's] identified medical limitations to enable [the claimant] to perform the Essential Duties of [the claimant's] Occupation or a reasonable alternative." (Supp.App. at AMER0017.) It is clear then that, to the extent Young can perform the essential duties of his job with accommodations, he is not entitled to benefits.

## III. Conclusion

Despite Young's attempt to transform his depression and associated mental health issues into a physical disability, the record adequately supports AI Life's determination that Young's mental and physical conditions did not equate to a physical disability that precludes him from working in his own occupation. Accordingly, it was not arbitrary or capricious for AI Life to deny him benefits. We will therefore affirm the judgment of the District Court.

---

10. Furthermore, since Young's job as an attorney is considered sedentary work that requires only the occasional lifting of up to ten pounds, it is unlikely that the need to engage in heavy lifting can fairly be considered an essential duty of the job. Although Young asserts in his affidavit that, as an attorney for AIG, he was regularly required to carry files, exhibits, and books ranging between twenty and one-hundred pounds, whether Young can perform his occupation as required by the Policy depends on whether he can perform the duties of that job as it exists in the general workplace.