**Helena BARINOVA, Appellant**

v.

**ING; ReliaStar Life Insurance Company.**

No. 08–4189.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Jan. 14, 2010.

Opinion filed: Feb. 4, 2010.

Steven D. Cahn, Esq., Harold A. Parra, Esq., Cahn & Parra, Edison, NJ, for Appellant.

William Daniel Hittler, I, Esq., Halleland, Lewis, Nilan & Johnson, Minneapolis, MN, Penelope M. Taylor, Esq., McCarter & English, Newark, NJ, for Appellees.

Before: AMBRO, CHAGARES, and STAPLETON, Circuit Judges.

## OPINION

AMBRO, Circuit Judge.

Helena Barinova brought an action against ING Financial Services ("ING") and ReliaStar Life Insurance ("ReliaStar") under the Employee Retirement Income Security Act ("ERISA").[1] *See* 29 U.S.C. § 1132(a)(1)(B). She alleged that ReliaStar improperly denied her claim for long-term disability benefits. The District Court granted the defendants' motion for summary judgement. We affirm.

### I.

As part of its employee welfare plan, Croda, Inc. ("Croda") secured a group long-term disability insurance policy (the "Policy") from ReliaStar. As the insurance carrier, ReliaStar both funds the Policy and adjudicates related claims. Importantly, in this role it has "final discretionary authority to determine all questions of eligibility and status and to interpret and construe the terms of this policy[ ] of insurance." App. 585.

Under the Policy, employees who become disabled are eligible for monthly payments, subject to certain requirements. Claimants must "be insured on the date [they] become disabled"—and, to continue to qualify as "insured" before then, they must remain "actively at work." App. 578. As defined by the Policy, a claimant is "actively at work" when she is "physically present at ... her customary place of employment with the intent and ability of working the scheduled hours and doing the normal duties of ... her job on that day." App. 582. Policy coverage ends when the employee is "no longer actively at work for the Policyholder." App. 577. The only relevant exception to this "actively at work" requirement is for employees on leave under the Family and Medical Leave Act ("FMLA").[2]

Finally, eligibility under the Policy is limited to disabled employees who are receiving "regular and appropriate care." App. 578. For care to qualify as "regular and appropriate," the employee must "personally visit a doctor as often as is medically required," as well as "receiv[e] care which conforms with generally accepted medical standards ... and is consistent

---

1. ING offers employee benefits products and services to companies through ReliaStar, its affiliate.

2. The Policy provides for the following:
   Certain employers are subject to the FMLA. If you have a leave from active work certified by your employer, then for purposes of eligibility and termination of coverage you will be considered to be actively at work. Your coverage will remain in force so long as you continue to meet the requirements as set forth in the FMLA.
   App. 577.

with the stated severity of [the employee's] medical condition." App. 583.

## II.

Barinova was initially hired by Croda as a research scientist in March 1992. By 2004, she worked as a research and development manager. On May 4, 2004, Croda placed Barinova on administrative leave for "alleged insubordination and disregard of company policy." App. 106. She remained on leave until she was terminated.

On May 17, 2004, Barinova visited a psychiatrist. During this visit, the psychiatrist completed an FMLA application for Barinova,[3] asserting that she had a "major depressive disorder" that required weekly treatment. App. 666. Croda accepted Barinova's application, and her FMLA leave began thereafter. On August 18, 2004, Barinova brought an action against Croda, alleging that she was placed on administrative leave in retaliation for raising asbestos-related health and safety concerns.

Barinova's twelve weeks of FMLA leave expired on September 1, 2004. During her leave, Barinova's treatment was limited to a few follow-up conversations with her psychiatrist (mostly by phone), as well as prescriptions for related medication.[4] On October 20, 2004, Barinova began more extensive treatment with a different psychiatrist.

Finally, by December 31, 2004, Barinova was terminated.[5] On January 20, 2005, Barinova filed a claim for long-term disability benefits under the Policy. ReliaStar denied her claim. Under the relevant Policy language, ReliaStar concluded that Barinova was: 1) "actively at work," but

not receiving "regular and appropriate care" during her FMLA leave (prior to September 1, 2004); 2) neither "actively at work" nor receiving "regular and appropriate care" between September 1, 2004 and October 20, 2004; and 3) receiving "regular and appropriate care," but not "actively at work," after October 20, 2004. As a result, ReliaStar concluded that Barinova never became eligible for long-term disability benefits under the Policy.

## III.

In May 2005, Barinova appealed ReliaStar's initial determination to its Appeals Committee. She submitted a letter from her psychiatrist stating that she was disabled by the time he evaluated her in October 2004, and she was likely disabled prior to then. ReliaStar used an outside, board-certified psychiatrist to review Barinova's file. This psychiatrist concluded that Barinova had not received "regular and appropriate care" for her depression before September 1, 2004.

In the end, the Committee "reviewed [Barinova's] adverse claim decision, in its entirety, giving no deference to the previous decision," and denied her appeal. App. 138. In March 2006, Barinova asked the Appeals Committee to reconsider its decision, but it declined. Barinova then brought the current ERISA action against ING and ReliaStar in federal court.

Before the District Court, Barinova argued: 1) that she was "actively at work" until she was terminated in December 2004; 2) that it was undisputed that she was receiving "regular and appropriate care" by October 20, 2004; and 3) that

---

3. FMLA provides medical leave for up to twelve weeks for qualifying diseases.

4. The psychiatrist was unable to locate Barinova's treatment records during this period.

5. There is confusion in the record over Barinova's precise termination date.

there was an issue of triable fact as to whether she was receiving "regular and appropriate care" before then. In granting the defendants' motion for summary judgment, the District Court upheld ReliaStar's determination as reasonable and "entitled to deference." App. 12. In particular, the Court "accept[ed] ReliaStar's determinations that Barinova was no longer 'actively at work' as of September 1, 2004, and was not under the regular and appropriate care of a physician prior to October 20, 2004." *Id.* Though it now appears that the District Court did not apply the correct standard of review, we nonetheless affirm its judgment.

The Court did not have the benefit of the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 2346, 171 L.Ed.2d 299 (2008), which clarified the standard of review that should be applied in similar contexts. As we explained in *Doroshow,* however, "[b]ecause the District Court applied [a] review standard [that] was more favorable to [the appellant] than the new standard, we find no prejudice in our considering [the appellant's appeal] using the *Glenn* standard without remanding." *Doroshow v. Hartford Life & Accident Ins. Co.,* 574 F.3d 230, 234 n. 1 (3d Cir.2009).

## IV.

The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) and (f). We have jurisdiction over this appeal under 28 U.S.C. § 1291. We "exercise plenary review over the District Court's decision to grant summary judgment." *Doroshow,* 574 F.3d at 233. "Summary judgment is appropriate when the 'pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law.' " *Id. (quoting* Fed.R.Civ.P. 56(c)).

## V.

"[ERISA] permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Glenn,* 128 S.Ct. at 2346. "Principles of trust law require courts to review [such a denial] 'under a *de novo* standard' unless the plan provides to the contrary." *Id.* at 2348 *(quoting Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). "Where the plan ... grant[s] 'the administrator or fiduciary *discretionary authority* to determine eligibility for benefits, trust principles make a *deferential standard* of review appropriate.' " *Id. (quoting Firestone,* 489 U.S. at 111, 109 S.Ct. 948) (internal citations omitted) (emphases in original). ReliaStar was granted such "discretionary authority" in this case.

Nevertheless, "[o]ften the [adjudicatory] entity ... both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." *Id.* at 2346. "[T]his dual role creates a conflict of interest." *Id.* However, we "continue to apply a deferential abuse-of-discretion standard of review in cases where a conflict of interest is present." *Schwing v. Lilly Health Plan,* 562 F.3d 522, 525 (3d Cir.2009). In these situations, we "take the conflict into account not in formulating the standard of review, but in determining whether the administrator or fiduciary abused its discretion." *Id.; see also Doroshow,* 574 F.3d at 234 (rejecting our prior "sliding scale" approach and applying *Glenn* by noting that "a reviewing court should consider the conflict of interest— but only as one consideration among many").

In this case, ReliaStar was the insurance carrier. In that capacity, it "both deter-

mine[d] whether an employee [wa]s eligible for benefits and pa[id] benefits out of its own pocket." *Glenn*, 128 S.Ct. at 2346. Therefore, ReliaStar had an incentive to deny benefits in certain cases to save itself money. We keep this conflict of interest in mind, as we evaluate ReliaStar's eligibility determination for abuse of discretion.[6] Nevertheless, each of Barinova's arguments fail.

■ First, Barinova argues that she remained "actively at work" until she was terminated in December 2004—in other words, while she was on administrative leave. She reasons that, even while on leave, she received both salary and related benefits. Furthermore, she had not yet been formally terminated by Croda. Given this status, she concludes that she should have qualified as "actively at work" under the Policy during this period, and therefore been eligible for long-term disability benefits.

Barinova's interpretation of the "actively at work" requirement is plausible; however, given the text of the Plan, it was not an abuse of discretion for ReliaStar to reject it. In its determination, ReliaStar interpreted "actively at work" to mean actually present at work or on FMLA leave—therefore, excluding employees on administrative leave (such as Barinova). To repeat, the Policy defines "actively at work" as "physically present at ... [one's] customary place of employment with the intent and ability of working the scheduled hours and doing the normal duties of ... [one's] job on that day." App. 582. The only relevant exception to this requirement is for employees on FMLA leave. We conclude that ReliaStar's interpretation of the "actively at work" requirement is consistent with the Policy's terms, and therefore not an abuse of discretion.[7] Given ReliaStar's interpretation, Barinova could not qualify as "actively at work" once her FMLA leave ended—from September 1, 2004, onward—since she remained on ad-

---

6. Barinova urges us also to consider her ongoing disagreements with Croda (including related litigation) while reviewing ReliaStar's denial of her disability claim. We agree to keep these disputes in mind; however, her complaints with Croda are not directly connected to ReliaStar. Rather, they are implicated only insofar as they relate to any information about Barinova provided by Croda to aid ReliaStar in its eligibility determination. Furthermore, we remain mindful that Barinova provided her version of events to ReliaStar (and to the District Court). *See, e.g.*, App. 129–31 (recounting Barinova's version of events to ReliaStar); *see also* App. 177–81 (providing Dr. Grigory Rasin's account of Barinova's history with Croda). Both ReliaStar and the District Court thus were able to take both versions of events into account when reaching their conclusions.

7. Barinova's other "actively at work" arguments are similarly unavailing. First, she argues that the "actively at work" requirement does not apply to her because an internal company document stated that she was eligi-

ble for benefits until November 12, 2004. She is mistaken. Instead, we agree with the District Court, which concluded that "it is not clear that the [relevant] document says anything at all about her eligibility." App. 16. Furthermore, such pre-printed, standard documents do not bind ReliaStar when it exercises its discretionary authority to interpret the Policy and make eligibility determinations—especially in cases (such as this one) where the document at issue is ambiguous (at best).

Second, Barinova argues that she was eligible for benefits under the "Continuity of Coverage" provision of the Policy. *See* App. 166–67. Again we disagree. This provision waived the "actively at work" requirement for employees not "actively at work" on the Policy's "effective date." App. 166. However, it does not apply to Barinova's situation, as she was "actively at work" on that date. Instead, it applies to transitional situations, where the company is changing from one plan to another. It is included to protect employees who were not "actively at work" (for whatever reason) on the "effective date" of the new policy.

ministrative leave until she was terminated. While Barinova satisfied the other eligibility requirements by October 20, 2004, she was no longer "actively at work" by then (and, therefore, not entitled to benefits under the Policy).

■ Second, Barinova argues that, even if she were not "actively at work" after September 1, 2004, there is a triable issue of fact whether she began receiving "regular and appropriate care" before September 1, 2004. Therefore, summary judgment was inappropriate. We also disagree.

When making its eligibility determination, ReliaStar undertook an independent review of Barinova's medical records, with the aid of an outside, board-certified psychiatrist. This psychiatrist explained that "regular and appropriate care" for someone with Barinova's condition "would include intensive psychotherapy . . . on, at least, a weekly basis by a doctoral level therapist," and (in a severe case) "a consideration of participation in a partial hospitalization program, intensive outpatient treatment, [and] cognitive/behavioral treatment, as well as medication." App. 521.

In the end, ReliaStar concluded that Barinova had offered little evidence that she received such care between May 17, 2004 and October 20, 2004. As the District Court further noted, Barinova conceded that "after her initial consultation with [her doctor in May 2004], she only received 'occasional counseling on a few occasions, kept in contact via phone[,] and [was] prescribed anti-anxiety and anti-depressive medications' [during this period]." App. 17.

In this context, we hold that ReliaStar did not abuse its discretion in concluding that Barinova failed to receive "regular and appropriate care" prior to October 20, 2004. Although she offered some evidence of the severity of her condition during this period, she presented little evidence to support her argument that the care she received at that time was "regular and appropriate."

\*       \*       \*       \*       \*       \*

For the foregoing reasons, we affirm the judgment of the District Court.

